UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SEAN O'NEILL,<br><br>   Petitioner,<br><br>v.<br><br>STU SHERMAN,<br><br>   Respondent. | | Case No.: 3:15-cv-02912-H-PCL<br><br>**ORDER:**<br><br>**(1) DENYING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>[Doc. No. 1]<br><br>**(2) ADOPTING REPORT AND RECOMMENDATION**<br><br>[Doc. No. 8]<br><br>**(3) DENYING CERTIFICATE OF APPEALABILITY** |

On December 25, 2015, Petitioner Sean O'Neill, a state prisoner convicted of attempted murder in connection with a street gang, filed the present petition for a writ of habeas corpus under 28 U.S.C. § 2254. (Doc. No. 1.) Petitioner argues that there is insufficient evidence to support his conviction as an aider and abettor in the attempted murder. (Id. at 6.)

## Background

### I. Procedural History

In July, 2012, a jury convicted Petitioner of the attempted murder of Robert Romero for the benefit of a criminal street gang (Count 1). (Doc. No. 6-2, Lodg. No. 1 at CT 423.) The jury found that Petitioner committed the crime willfully, deliberately, and with premeditation, and that Petitioner was a principal in the offense.[1] (Id. at CT 423–24.) Petitioner was also convicted of the attempted murder of Chula Vista Police Department ("CVPD") Agent Ricardo Cruz (Count 2), assault with a deadly weapon on a peace officer (Count 3), resisting an executive officer (Count 4), and evading an officer with reckless driving (Count 5), all committed in association to a street gang. (Id. at CT 425–28.)

On appeal, Petitioner contended that there was insufficient evidence to support his conviction on Count 1 as an aider and abettor, and that there was insufficient evidence to support his convictions on the remaining counts based on a theory of natural and probable consequences. (Doc. No. 6-12, Lodg. No. 3 at 10–13.) The California Court of Appeal affirmed Petitioner's conviction and sentence on Count 1, but reversed the convictions on Counts 2 through 5 on the ground of insufficient evidence. (Doc. No. 6-14, Lodg. No. 5 at 3–4, 32.) Petitioner was sentenced to a total term of four years, plus fifteen years to life with the possibility of parole, plus twenty-five years to life with the possibility of parole. (Doc. No. 6-3, Lodg. No. 1 at CT 512.) On October 1, 2014, the California Supreme Court summarily denied Petitioner's petition for direct review of Count 1. (Doc. No. 6-16, Lodg. No. 7.)

---

[1] The jury found that at least one principal personally used a handgun and proximately caused great bodily injury. (Doc. No. 6-2, Lodg. No. 2 at CT 424.) Petitioner was tried as an aider and abettor in the attempted murder of Romero. According to California law, "[a]ll persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed." Cal. Penal Code § 31.

On December 25, 2015, Petitioner timely filed the present federal petition for a writ of habeas corpus before this Court, again arguing there was insufficient evidence to support his conviction on Count 1. (Doc. No. 1 at 6.) On March 8, 2016, Respondent filed an answer and lodged the relevant state court records. (Doc. Nos. 5, 6.) On April 14, 2016, Petitioner filed a traverse. (Doc. No. 7.) On May 10, 2016, the magistrate judge issued a report and recommendation recommending denying the petition. (Doc. No. 8.) On June 1, 2016, Petitioner filed an objection to the report and recommendation. (Doc. No. 9.) For the reasons set forth below, the Court denies the petition for a writ of habeas corpus and adopts the magistrate judge's report and recommendation.

## II. Factual History

The Court adopts the facts from the California Court of Appeal's opinion denying Petitioner's direct appeal and affirming his conviction. (See Doc. No. 6-14, Lodg. No. 5.) This Court, pursuant to 28 U.S.C. § 2254(e)(1), presumes the following facts to be correct:

### A. The People's Evidence

At approximately 1:00 a.m. on April 23, 2011, Robert Romero stepped outside of Wild Woolly's bar on the corner of Broadway and Davidson in Chula Vista to make a phone call. Romero walked across the street to get away from the noise from the bar. After crossing the street, Romero saw two, or possibly three, men walk out from the alley behind the bar, coming toward him. As the men approached, one asked Romero "Where are you from?" and said "F*** VCV." Before Romero could respond, one of the men shot Romero twice in the chest. Romero fell to the ground. The men continued to approach Romero as he crawled backward, yelling at the shooter to stop. The same man shot Romero three more times, in the side, stomach and leg. The men then ran away. At trial, Romero testified that he could not identify the shooter, but said that the man's size and skin color matched Martinez's. One of the bullets pierced both of Romero's lungs and one of his lungs collapsed. Two bullets remain lodged in Romero's back and one is his left leg. Romero was hospitalized for almost a month. At the time of trial, he continued to experience constant pain.

After the perpetrators fled, Romero managed to stand up and begin walking back toward Wild Woolly's. Around the same time, Agent Cruz was patrolling the area near Wild Woolly's and saw a crowd gathering at the intersection of Broadway and Davidson. Agent Cruz turned onto Davidson,

where a bystander told him that someone had been shot. As Agent Cruz was asking the bystander for more information, Romero walked up to Agent Cruz's car and pulled open his shirt, revealing the gunshot wounds. Romero told Agent Cruz that he had been shot. As Agent Cruz picked up his microphone to call for help, several members of the crowd were pointing to East Park Lane, the alley behind the bar where cars were parked. Agent Cruz told Romero that help was on the way and then drove toward the alley, where he saw a car's brake lights, and then its reverse lights, turn on. Agent Cruz could hear people in the crowd shouting "That's the car. They are over there. They are in that car."

Agent Cruz followed the car as it headed north on East Park Lane. When Agent Cruz caught up with the car, a white Toyota Solara, he turned on his police cruiser's overhead lights. The Solara did not pull over. As Agent Cruz continued following the car, he radioed the direction of travel and a description of the Solara and its license plate number. The Solara ran through a stop sign, but then slowed down as Agent Cruz approached. Fearing an ambush, Agent Cruz hung back. The car then abruptly accelerated to 30 or 40 miles per hour. Agent Cruz followed the Solara, maintaining a distance of 10 to 15 yards. The Solara turned onto Beech Avenue and Agent Cruz again radioed the direction of travel and turned on his siren. The Solara sped through two more stop signs and bottomed out twice, sending sparks from under the car. The Solara then turned onto Madrona Street, a cul-de-sac, and drove slowly down the street and around the loop.

Agent Cruz followed the Solara onto Madrona, but stayed in the straight part of the road, facing the loop. Agent Cruz stopped his car close to the left side of the street, next to a parked truck. Agent Cruz positioned his patrol car so that the driver of the Solara would be forced to exit the loop of the cul-de-sac on the right, passing the patrol car on its passenger side, if he attempted to flee. When Agent Cruz pulled his car into position, the Solara stopped and faced him. Agent Cruz saw a male driver and O'Neill in the passenger seat. Agent Cruz testified that he made eye contact with both men and that neither man reacted or showed any emotion. The driver of the Solara pulled the car out of Agent Cruz's field of vision. Agent Cruz got out of his patrol car so that he could see the Solara. The Solara was facing Agent Cruz. Agent Cruz again made eye contact with both men, drew his gun and pointed it at the driver. Agent Cruz shouted repeatedly at the men to show their hands and turn off the car.

The driver of the Solara revved the car's engine and drove directly at Agent Cruz. Agent Cruz fired his gun at the car five times in rapid succession. The Solara remained on its path toward Agent Cruz, who attempted to take cover

inside his patrol car. The Solara hit the driver's side door of Agent Cruz's patrol car, which in turn hit Agent Cruz and sent him head first into the roof of the patrol car. Agent Cruz momentarily lost consciousness. The Solara ran over Agent Cruz's leg and foot, crushing part of his leg between the car door and frame. Agent Cruz radioed for help. He saw the Solara behind him, heading out of the cul-de-sac. CVPD officer, Eric Thunberg, responded to Agent Cruz's call and headed to Agent Cruz's location. Thunberg saw the Solara make a wide right turn onto Beech from Madrona. He later identified Martinez as the driver of the car. Because Thunberg had just heard Agent Cruz's radio call reporting that he was hurt, Thunberg went to assist Agent Cruz rather than pursue the Solara.

Agent Cruz's injuries included a broken left foot, crushed shin, soft tissue damage to his left knee, hip and right arm, a concussion, bruises on his face, head and chest and cuts to his right arm and chest from the patrol car's door. Agent Cruz continued to experience pain and discomfort at the time of the trial.

Shortly after Agent Cruz left Wild Woolly's to pursue the Solara, another police officer arrived at the bar. He saw a crowd outside and Romero lying on the ground. Someone in the crowd shouted that one of the men who had approached Romero was wearing a Padres jacket. Romero could not recall what the suspects had been wearing. Additional police officers arrived to contain the scene and begin an investigation. Six .22 caliber ammunition rounds, including one unfired cartridge and five fired casings, were found in a dumpster in the alley next to Wild Woolly's. The bar's video surveillance footage from the timeframe of the shooting showed two people walking out of the alley and then running back down the alley. The video also showed someone opening the dumpster and placing something inside. In addition, the video had footage of Agent Cruz's patrol car turning down the alley and proceeding northbound. After cordoning off the path of Agent Cruz's pursuit, police found a knife and a loaded revolver in the gutter.

Fingerprints were found on the gun, but they did not have enough detail to be identified. When tested, the gun fired only intermittently. It was determined that the expended cartridges found in the dumpster had come from the revolver that police found in the gutter. Martinez's brother was the owner of the Solara. When questioned by police on the morning of April 23rd, he told the officers that Martinez had borrowed the car the night before and had not yet returned it. The Solara was found later that day, parked in a walkway near a church. There was a bullet hole in the hood of the car. Inside the car, police found a box containing .22 caliber cartridges that were consistent with the casings found in the dumpster. O'Neill's fingerprints were found on the

Solara's passenger's side door and Martinez's palm print was found on the hood. Investigators also found Martinez's DNA on the steering wheel and the driver's side door, and on a nearby picnic table and wall. Additionally, a Vons receipt for a six-pack of beer dated April 22 at 7:39 p.m., which police found near the Solara, corresponded with video surveillance footage from Vons that depicted two men dressed like the men seen running down the alley in the Wild Woolly's surveillance video. One of the men shown on the recording was wearing clothing that matched the clothing found in O'Neill's home.

At trial, CVPD detective Bryan Maddox testified as an expert on criminal street gangs. Maddox identified both O'Neill and Martinez as longtime members of the Otay criminal street gang.[2] Maddox testified that the Otay gang is a rival of the Varrio Chula Vista street gang, or VCV, which claims Wild Woolly's as part of its territory. He stated that gang members go into rival gang territory to commit crimes and to expand their own territory. According to Maddox, because of the danger associated with going into rival territory, gang members on such missions might not wait to find a known rival gang member to assault. Instead, they assault anyone who they think may be associated with the rival gang.

Maddox told the jury that committing a crime involving a police officer, even just running away from police, is a crime that elevates a gang member's status. Further, "[c]ommitting a violent assault against [a law enforcement] officer, [particularly] on the heels of committing another violent assault, . . . is considered the cream of the crop when it comes to gang crimes. . . ." Maddox testified that murders of rival gang members and police officers, as well as evading police, are crimes that are committed for the benefit of the gang.

> [2] Both men had admitted to being Otay members and they were documented as gang members by the CVPD, as well. O'Neill also stipulated to being a gang member. He has multiple gang-related tattoos, including one on his head that reads "F*** CV" and another across his stomach that says "Otay."

**B. The Defense**

Defense counsel argued that neither Martinez nor O'Neill was involved in the shooting of Romero. Both counsel stressed that there were no eye witnesses to the shooting. Defense counsel posited that the shooter could have been an enemy of Romero who had recently been released on bail for alleged heroin distribution, and who had also recently testified as a witness in a murder trial. With respect to the attempted murder of Agent Cruz, Martinez's counsel argued that Martinez was merely trying to evade Agent Cruz and did not intend to harm him. Counsel theorized that Martinez tried to evade Agent Cruz because he feared being caught drinking and driving, particularly

because he was not yet 21. Martinez's counsel told the jury that Martinez had driven toward Agent Cruz, rather than around him, because he was trying to avoid being shot by Agent Cruz. O'Neill's counsel contended that there was no reliable evidence that O'Neill was in the car at the time it hit Agent Cruz, and that even if O'Neill was in the car, the prosecution failed to establish that O'Neill had done anything that would make him liable as an accomplice to the crimes.

(Doc. No. 6-14, Lodg. No. 5 at 4–10.)

## Discussion

### I. Legal Standards

Since Petitioner filed the present federal habeas petition after April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs the petition. See Lindh v. Murphy, 521 U.S. 320, 326–27 (1997); Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004) (en banc). Under AEDPA, a federal court may review a habeas corpus petition by a person in custody pursuant to a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Cullen v. Pinholster, 563 U.S. 170, 181 (2011). A habeas petition that includes a claim that has been adjudicated on the merits by the state courts will not be granted "unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

28 U.S.C. § 2254(d)(1)–(2); Pinholster, 563 U.S. at 181. "AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). The petitioner carries the burden of proof. See Pinholster, 563 U.S. at 181.

For purposes of 28 U.S.C. § 2254(d)(1), a state-court decision is "contrary to" the Supreme Court's clearly established precedent if "the state court applies a rule different

from the governing law set forth in [the Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." Bell v. Cone, 535 U.S. 685, 694 (2002). A state-court decision is "an unreasonable application" of the Supreme Court's clearly established precedent if "the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Williams v. Taylor, 529 U.S. 362, 407 (2000). Moreover, under the "unreasonable application" prong, the state-court decision must have been more than incorrect or erroneous; it must have been objectively unreasonable. See Wiggins v. Smith, 539 U.S. 510, 520 (2003); Lockyer v. Andrade, 538 U.S. 63, 76 (2003).

In conducting an analysis under AEDPA, the federal habeas court looks to the last reasoned state-court decision. See Castellanos v. Small, 766 F.3d 1137, 1145 (9th Cir. 2014); Murray v. Schriro, 745 F.3d 984, 996 (9th Cir. 2014). Where there is an unexplained decision from the state's highest court, the federal habeas court "looks through" to the last reasoned state-court decision and presumes that the unexplained opinion rests upon the same ground. Ylst v. Nunnemaker, 501 U.S. 797, 805–06 (1991).

Here, Petitioner bases his petition on insufficiency of evidence, under the standard in Jackson v. Virginia, 443 U.S. 307, 309 (1979). The Due Process Clause of the Fourteenth Amendment prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt. See id. Under Jackson, a habeas petitioner challenging the sufficiency of the evidence to support his state criminal conviction may obtain relief only if "it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Id. at 324. Therefore, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319.

8

3:15-cv-02912-H-PCL

In applying Jackson's standard, federal courts must look to state law for the substantive elements of the criminal offense. See id. at 324 n.16; Coleman v. Johnson, 132 S. Ct. 2060, 2064 (2012) (per curiam). California law provides that "a person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." People v. Beeman, 35 Cal. 3d 547, 561 (1984).

"Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." Coleman, 132 S. Ct. at 2062. First, on direct appeal, a reviewing court can only set aside the jury's verdict on the ground of insufficient evidence if no rational trier of fact could have agreed with the jury. See Cavazos v. Smith, 132 S. Ct. 2, 4 (2011) (per curiam). Second, on collateral review, a federal court can only overturn a state court's decision rejecting a sufficiency of the evidence challenge if the state court's decision was objectively unreasonable, but can not do so simply because the federal court disagrees with the state court. See id. The Ninth Circuit also adopts an additional degree of deference when applying Jackson's standard on sufficiency of evidence in habeas petitions. See Boyer v. Belleque, 659 F.3d 957, 964–65 (9th Cir. 2011); Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).

**II. Analysis**

Petitioner argues that there is insufficient evidence to support his conviction of attempted murder, (Doc. No. 1), and that the California Court of Appeal's decision affirming his conviction is an unreasonable application of Jackson's "no rational trier of fact" standard, (Doc. No. 9). Petitioner contends that he did not know of Martinez's unlawful purpose, and that he did not assist or encourage Martinez in committing the crime. (Doc. No. 1 at 25.) Under Jackson, this Court looks to the substantive requirements of state law to evaluate the sufficiency of the evidence. See 443 U.S. at 324 n.16. Under California law, a person aids and abets the commission of a crime when he acts with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing,

encouraging, or facilitating the commission of the offense, and his act or advice aids, promotes, encourages, or instigates the commission of the crime. See Beeman, 35 Cal. 3d at 561.

The California Court of Appeal reasoned that Petitioner's companionship with co-defendant Martinez during the offense, as well as their conduct before and after the offense, could have led the jury to draw reasonable inferences and find Petitioner liable as an aider and abettor. (Doc. No. 6-14, Lodg. No. 5 at 24–26.) The Court of Appeal relied on evidence showing that Petitioner "purchased beer with Martinez hours before the shooting and accompanied Martinez into rival gang territory, where one of the men issued a verbal challenge to Romero before Martinez shot him." (Id. at 25.) Agent Cruz, who chased down the Solara fleeing from the crime scene, saw Petitioner in the passenger seat. (Id. at 6.) Surveillance footage from the bar showed two men walking out and running down the alley around the time of the shooting, and clothes worn by one of the men matched those found in Petitioner's home. (Id. at 7–8.) "[Petitioner] did not independently happen by the scene of the crime. Rather, Martinez and [Petitioner] knowingly approached and challenged Romero, acting in concert." (Id. at 25.) Additionally, the prosecution's expert testimony supported the theory that "[Petitioner] and Martinez went into rival gang territory together, with the intention of shooting a member or members of a rival gang, on behalf of their own gang." (Id. at 26.) "Since there was no evidence that [Petitioner] was surprised by Martinez's conduct or that he was afraid to interfere with Martinez, the jury could reasonably conclude that [Petitioner] was there to participate and intimidate Romero." (Id.)

Petitioner argues that there is a lack of direct evidence on his intent to encourage or facilitate the attempted murder, and that it is unreasonable for the state court to affirm his conviction based on circumstantial evidence. (Doc. No. 1 at 35–36.) As the California Court of Appeal recognized, however, "[i]ntent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense." People v. Pre, 117 Cal. App. 4th 413, 420 (2004); see also United States v. Cordova Barajas, 360

F.3d 1037, 1041 (9th Cir. 2004) ("[C]ircumstantial evidence alone can be sufficient to demonstrate a defendant's guilt."); Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995) ("[C]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction."). Accordingly, the Court of Appeal concluded that "[the evidence] is sufficient to support the finding that [Petitioner] aided and abetted the attempted murder of Romero." (Id. at 25.)

Affording due respect to the fact-finding role of the jury and the state court's judgment, this Court concludes that the evidence at Petitioner's trial is sufficient to establish his knowledge, intent, and participation in the attempted murder of Romero. See Beeman, 35 Cal. 3d. at 561. On the basis of the trial evidence, a rational jury could infer that Petitioner accompanied a fellow gang member into rival gang territory for the purposes of committing crimes, and that they verbally challenged and shot the victim multiple times before fleeing the scene together. As a result, this Court concludes that there is sufficient evidence as required by due process to support Petitioner's conviction, and that the California Court of Appeal decision is a reasonable application of the Jackson standard.

## Conclusion

For the foregoing reasons, the Court denies Petitioner's petition for a writ of habeas corpus and adopts the magistrate judge's report and recommendation. (Doc. Nos. 1, 8.) Additionally, since the Court concludes that reasonable jurists would not find the Court's assessment of Petitioner's claim debatable or wrong, the Court denies Petitioner a certificate of appealability. See 28 U.S.C. § 2253(c)(2); see also Slack v. McDaniel, 529 U.S. 473, 484 (2000) (certificate of appealability may issue only if reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong).

**IT IS SO ORDERED.**

DATED: June 7, 2016

*/s/ Marilyn L. Huff*
MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT